# New York Trust Company, Appellant, v. Langcliffe Coal Company (No. 1).

*Practice, equity — Mortgages — Bonds — Substituted bond and mortgage—Security for loans—Remedies for enforcing payment.*

1. The mere fact that a creditor has several securities for his debt does not confer jurisdiction on equity to enforce payment of his claim.

2. Where the holder of a substituted bond and mortgage of a coal company, securing the same loan and including the same land as an original bond and mortgage given by two individuals, also holds an agreement with a default clause whereby the property of the coal company, not included in the original mortgage, is made security for the payment of the original and substituted bonds and mortgages, and a further agreement whereby the whole of the capital stock of the coal company is to be held under full powers as additional security for the loan, such holder has adequate and effective remedies at law

for enforcing payment of the loan and does not require the aid of a court of equity in case of default.

*Practice, equity—Bill for an accounting—Discovery.*

3. Where a bill shows no ground for an accounting, a prayer for discovery, incidental to the accounting, must be denied.

Argued Feb. 23, 1910. Appeal, No. 385, Jan. T., 1909, by plaintiff, from decree of C. P. Lackawanna Co., May T., 1908, No. 14, dismissing bill in equity in case of The New York Trust Company of the City of New York v. The Langcliffe Coal Company, Limited, The Langcliffe Coal Company, The Hudson Coal Company, Thomas R. Brooks, George G. Brooks and John H. Brooks, executors of the will of Reese G. Brooks, deceased, J. Farnham Mears and The Lackawanna Trust & Safe Deposit Company, executors of the will of John A. Mears, deceased. Before FELL, C. J., BROWN, MESTREZAT, POTTER and MOSCHZISKER, JJ. Affirmed.

Bill in equity for the adjudication of the parties' rights against certain properties under a mortgage and agreement and for a sale of the properties and for discovery and relief in connection therewith. Before EDWARDS, P. J.

EDWARDS, P. J., filed the following opinion:

The causes of demurrer assigned by the three defendant companies are the same.

1. Under the allegations of the twenty-fifth paragraph of plaintiff's bill the New York, Susquehanna & Western Coal Company should have been joined as defendant.

2. The plaintiff has a good, sufficient and adequate remedy at law.

3. The plaintiff's bill is multifarious.

The causes of demurrer assigned by the executors of Reese G. Brooks, deceased, and by the executors of John A. Mears, deceased, are the want of jurisdiction in equity, plaintiff having an adequate remedy at law; the failure to join the New York, Susquehanna & Western Coal Company as defendant; and particularly that plaintiff's bill discloses no cause of action of any kind against Brooks or Mears either in law or equity.

While the bill and exhibits cover 130 printed pages, there being fourteen exhibits, some of them very lengthy, the lines of the various controversies between the parties are well defined and require the application of only a few plain principles of law.

The transactions between the principal parties concerned in the case began on April 20, 1892. On that day four written instruments were executed. They are exhibits "A," "B," "C" and "D."

Exhibit "A": An agreement between Brooks and Mears and the Wilkes-Barre & Hudson River Improvement Company, hereinafter, for convenience called the Hudson company. This agreement includes a coal and tonnage arrangement between the parties, and the Hudson company agrees to advance $325,000 to Brooks and Mears on bond and mortgage for the development and improvement of their mines.

Exhibit "B": An agreement between the Langcliffe Coal Company, first party; the Hudson company, second party; and Brooks and Mears, third party. This is a tonnage agreement only. It is the same as exhibit "A," except that it contains no reference to the loan of $325,000. Brooks and Mears join in the agreement because they were the owners of all the capital stock of the Langcliffe Coal Company. The land described in exhibit "B" is not included in exhibit "A."

Exhibit "C": The bond and mortgage given by Brooks and Mears to the Hudson company to secure the loan of $325,000, reciting exhibit "A" and covering only the land therein described.

Exhibit "D": An agreement between Brooks and Mears and the Hudson company, providing, inter alia, that as Brooks and Mears were about to form a limited partnership association, which, when formed was to issue its first mortgage bonds to cover the amount unpaid on the said loan, the Hudson company, on delivery to it of said mortgage bonds would "cancel and discharge" the bond and mortgage exhibit "C"; and Brooks and Mears also agree that the said limited partnership association would enter into a tonnage contract with the Hudson company, or any company it would name.

The foregoing agreements and bond and mortgage, all signed on the same day are to be considered together. Brooks and Mears needed money to improve their coal properties and the Hudson company wanted the coal. A tonnage agreement was entered into, a loan was arranged and a mortgage was given to secure the loan. This mortgage did not cover the land of the Langcliffe Coal Company. It could not legally, because the lessor of the Langcliffe land would not consent to a conveyance of it from the Langcliffe Coal Company to Brooks and Mears, and, consequently, it could not be included in the mortgage, exhibit "C." It appears by later agreements, that it was intended all the time that the Langcliffe land should be security for the loan of $325,000, equally with the Brooks and Mears land embraced in the mortgage; because all the land, the Brooks and Mears' and the Langcliffe's, constituted one mining operation, and the money advanced by the Hudson company was used necessarily for the benefit of both properties. It is this element in the case—the effort by means of subsequent agreements to make and hold the Langcliffe land liable for said loan in the same manner and to the same extent as the land included in the Brooks and Mears mortgage, that accounts for any complications in the controversy between the parties; and it is this phase of the case that gives the plaintiff a color of right to come into a court of equity for relief.

Before considering the subsequent agreements above referred to, it is desirable to trace the history of the Brooks and Mears bond and mortgage, exhibit "C." The next paper showing what was done with the mortgage is,

Exhibit "E": On August 15, 1893, the Hudson company assigns the Brooks and Mears bond and mortgage to the Continental Trust Company. The assignment is made subject to the right to "exchange and substitute for said bond and mortgage the bond and mortgage upon the same property, of the joint stock or limited partnership in said agreement described" (being exhibit "D").

The next exhibit relating to the mortgage, although not the next transaction in point of time, is

Exhibit "I": This is a mortgage, dated March 23, 1896,

given by the Langcliffe Coal Company, Limited, to the Continental Trust Company, of the city of New York. It is for the same debt and includes the same land specified in the original Brooks and Mears mortgage and it recites the assignment of the latter or old mortgage to the Continental Trust Company on August 15, 1893.

It is evident that, according to the original intention of the parties, and prior to April 23, 1896, the Langcliffe Coal Company, Limited, was formed. In pursuance to the agreement of April 20, 1892, exhibit "D," and following the condition expressed in the assignment to the Continental Trust Company of the old bond and mortgage, the latter company accepted the new bond and mortgage from the Langcliffe Coal Company, Limited, in lieu of the old. The new mortgage recites the right to substitute one for the other and it contains the usual default clauses and the right to issue scire facias, etc. It is hardly necessary to discuss the law applicable to such a state of facts. All liability under the Brooks and Mears bond and mortgage has been canceled: The debt has been extinguished. And this has been done, not by operation of a principle of law only, but by the express understanding and agreement of all the parties concerned. As to the law on this point we refer to Hosler v. Hursh, 151 Pa. 415, and Neale v. Dempster, 179 Pa. 569.

So far then, and without reference to any other agreements, the Continental Trust Company, or its successor, the plaintiff, holds the mortgage given by the Langcliffe Coal Company, Limited, as the only security for the loan of $325,000. It has nothing else; and, for the enforcement of the payment of the amount of this mortgage it has a complete and adequate remedy at law.

This being the case, why does the plaintiff come into a court of equity? To answer this question, the other agreement not yet discussed must be considered. The source of plaintiff's claim to equitable relief must be found, if found at all, in the right of the plaintiff to the Langcliffe land as additional security for the loan and in the agreement as to the Langcliffe capital stock. Plaintiff contends that it cannot establish or

enforce this right by any adequate legal remedy; and that if equity ought to intervene to adjudicate a part of plaintiff's claim, then, under a well-known principle, equity has its grasp on the whole controversy. On this point we shall examine the other agreements, in order to ascertain how for the plaintiff's contention is sustained.

1. Exhibit "F": This agreement is dated September 25, 1893. The parties to it are the Langcliffe Coal Company, the Hudson company, and Brooks and Mears. It recites the "Brooks contract" (exhibit "A"), and the "Langcliffe contract" (exhibit "B"). It sets forth more fully why the land embraced in the Langcliffe contract was not included in the Brooks and Mears original mortgage; and it proceeds to state that its intent is to constitute the Langcliffe land an additional security for the payment of the loan of $325,000. This agreement recites the oft-repeated clause as to the substitution of one mortgage for the other, and it sets forth a promise on the part of the Langcliffe Coal Company to pay the said loan at the rate of fifteen cents on each ton mined. The agreement has in it a sixty-day default clause, and there is attached to it a schedule containing a full description of the Langcliffe property. The eighth paragraph of the agreement reads thus: "This agreement shall take effect as of the twentieth of April, 1892, and shall be deemed to be made as additional security for the payment of said bond and mortgage of the parties of the third part (Brooks and Mears) and of said substituted bond and mortgage, and for the repayment of said advance, and shall pass as an incident of said bond and mortgage, and of said substituted bond and mortgage, or any transfer thereof." The only promise made by Brooks and Mears in the agreement is that they will enter into a tonnage agreement with the Hudson company when requested to do so.

2. Exhibit "G": An agreement between Brooks and Mears and the Hudson company, dated September 25, 1893, by which Brooks and Mears assign and transfer to the Hudson company and its assigns the entire capital stock of the Langcliffe Coal Company, which was 3,000 shares. This agreement contains many recitals similar in character to those in the preceding

agreement, exhibit " F," and it gives the Hudson company full power, in case of default, to sell or transfer the whole capital stock assigned as aforesaid; or, to take possession of the property and work the mines.

On September 28, three days after the date of the above agreements, the Hudson company assigned the same to the Continental Trust Company. It is provided in the assignment that the trust company is not to assume " any of the covenants or agreements of said agreement (exhibit 'F'), on the part of the Improvement Company." This means that the trust company will not undertake to transport the coal and furnish cars, etc.; that is, all obligations incident to the tonnage arrangements still rest on the Hudson company.

On this date, September 28, 1893, what is the situation of the Continental Trust Company in relation to the loan of $325,000? What is the nature of the securities it has within its control, and what remedies are open to it to enforce the repayment of the loan in case of default?

1. The trust company has an assignment of the Brooks and Mears mortgage. This assignment was made in the preceding month of August. The mortgage contains the usual clauses as to default and provides the usual remedy for collection.

2. The trust company has also exhibit " F," one of the agreements signed September 25, 1893. This is the additional security consisting of the property of the Langcliffe Coal Company. By this agreement the trust company has its grasp on the Langcliffe property in addition to the Brooks and Mears property. What is the legal character of this agreement? An examination of it will show that it is in itself a complete legal instrument imposing upon the Langcliffe Coal Company a definite legal obligation, capable of enforcement by an adequate legal remedy. The default clause in the seventh paragraph of the agreement reads thus: " In case of default on the part of the party of the first part, its successors or assigns, in any of the obligations hereof on the part of it, them or any of them, and such default shall continue for the space of sixty days, the whole of said principal sum of three hundred and ' twenty-five thousand dollars, with all arrears of interest, shall

and may, at the option of the party of the second part, its successors or assigns, become and be forthwith due and payable." Without regard to this default clause and to the character of the agreement as an independent and separate instrument, it might be regarded in another light in view of the eighth paragraph of the agreement, which we have quoted in another place. By this paragraph the agreement is in effect attached to the Brooks and Mears mortgage; it is made to "pass as an incident of said bond and mortgage, and of said substituted bond and mortgage, or any transfer thereof." Why could not this agreement and the Brooks and Mears mortgage be treated as one obligation for the payment of the loan of $325,000? And why could not a judgment be obtained in scire facias proceedings which would cover the Langcliffe property as well as the Brooks and Mears property? It is not for us to decide now which one of three or four legal remedies would be the most effective. That should be left to the judgment of counsel. All we say at present is that we see no reason yet why plaintiff should come into a court of equity.

3. In addition to the foregoing securities the trust company by exhibit "G" has in his grasp, as additional security for the same loan, the entire capital stock of the Langcliffe Coal Company, with summary power to dispose of the same. Under this agreement the trust company has more than one complete remedy incident to its ownership of the capital stock. The remedies are summary and quite drastic. In case of default in any of the conditions contained in the Brooks and Mears bond and mortgage the holder of said stock may deal with it as if the holder were the "absolute beneficial owner thereof;" or, the stock may be sold or transferred for such price as the holder shall think fit; or, the holder "may enter into possession of the corporate property, or any part thereof and work said mines;" or, it may "as the owner of all the stock of said Langcliffe Coal Company, sell and realize the property of said company or any part of such property," applying the proceeds "to the payment of said bond and mortgage of the mortgagors, or of said substituted bond and mortgage."

It therefore clearly appears that from September 28, 1893,

to March 23, 1896, the securities in the hands of the trust company remained unchanged. It had the Brooks and Mears bond and mortgage; it had the Langcliffe property as additional security; and, as further security, it had the entire capital stock of the Langcliffe Coal Company. If, during this period, there had been any default in the payment of the loan, either of principal or interest, the trust company had adequate and efficient legal remedies to enforce the payment of the loan. The date of March 23, 1896, was given by us above because it was at this time that the Langcliffe Coal Company, Limited, substituted its bond and mortgage from the original bond and mortgage of Brooks and Mears. The new bond and mortgage were given direct to the Continental Trust Company, as stated by us already. The limited company had evidently been formed as early as 1893 (after September 28) because plaintiff's bill states that in 1893 and 1894 Brooks and Mears, by two deeds, had conveyed their interests in the lands embraced in the original mortgage, to the Langcliffe Coal Company, Limited.

Confining our consideration of this case now to the liability of Brooks and Mears and their individual estates, it appears clear to us that when the bond and mortgage of the limited association were substituted for the original Brooks and Mears bond and mortgage, every vestige of individual liability on the part of Brooks and Mears was wiped out. There can be no question as to the soundness of this conclusion so far as the old bond and mortgage are concerned; nor can there be any question arising from the nature of the agreement, exhibit " F," because, so far as it touches the merits of plaintiff's contention this was the agreement of the Langcliffe Coal Company, a corporation, with the Hudson company. It is true that Brooks and Mears signed the agreement; but an examination of its provisions will show that whatever was therein promised to be done which might be of any benefit to the plaintiff was promised by the Langcliffe Coal Company, and not by Brooks and Mears. But, independently of this fact, we hold that the plaintiff has an adequate legal remedy by which all of its rights under this agreement might be enforced, as we have already stated.

Therefore, so far as the present controversy relates to the individual liability of Brooks and Mears, there is nothing left but the agreement, exhibit "G," by which the entire capital stock of the Langcliffe Coal Company was assigned to the Continental Trust Company, which means to the plaintiff in this case. A large part of plaintiff's argument is devoted to this transaction. It is claimed that the plaintiff is a trustee for Brooks and Mears for the pledged stock; that the equities arising out of the relation of trustee and beneficiary cannot be adjusted in an action at law, and that this matter, being strictly cognizable in equity, draws to it and with it into a court of equity every other branch of the controversy between the parties. This agreement seems plausible, and under a proper state of facts would be convincing; but the facts of the present case destroy the effectiveness of the argument. It must be remembered that neither Brooks and Mears, nor anybody representing their interests, are demanding relief on account of any act of a trustee in connection with said capital stock. From September 28, 1893, the plaintiff, or its predecessor, has had the absolute power to dispose of the stock by sale or transfer at any price it pleased in case of default in the payment of the loan of $325,000.

And Brooks and Mears had given the power to the assignee of the stock, not only to sell or transfer the stock, but also, in case of default in the payment of the loan, to take possession of the property, work the mines and to take over the corporate organization of the Langcliffe Coal Company. Has the Continental Trust Company, or the plaintiff, at any time attempted to enforce any of the ample legal remedies provided in the agreement, exhibit "G"? The precise date when the default in the payment of the loan first occurred cannot be ascertained clearly from the bill; yet, if several of the allegations of the bill are true, there was a default in the performance of some of the conditions of the various agreements quite early in the history of the transactions detailed in this case. It is stated that Brooks and Mears were in default. If that be the case, then the Continental Trust Company could have foreclosed the Brooks and Mears mortgage at some time dur-

ing the period between August 15, 1893, the date of the assignment of said mortgage, and March 23, 1896, the date of the substitution of the new for the old bond and mortgage. Was the Langcliffe Coal Company in default, say from September 28, 1893, the day of the assignment of the agreements, exhibits "F" and "G," to the trust company, to the date of the giving of the new bond and mortgage in 1896? Then, and in that case, the trust company had a choice of legal remedies under said agreements. It had the right to take possession of the mines, or to sell the entire capital stock of the Langcliffe Coal Company, or to take the company and reorganize it. It is a significant fact that when the trust company in 1896 accepted the bond and mortgage of the limited association in lieu of the Brooks and Mears bond and mortgage, nothing was done to enforce the obligations contained in exhibits "F" and "G," or to put the securities relating to the Langcliffe company's property and capital stock in better or different shape. It may be that all the parties were satisfied with matters as they stood at that time; or, it may be that recognizing the uncertain value of the security of the Langcliffe property under exhibit "F," because of the defect in the title, the trust company did not choose to make any attempt to realize on this security, until the defect was removed by obtaining the consent of the lessor of the Langcliffe property to the alienation of the same. Of course the same objection would not apply to the agreement relating to the capital stock, viz., exhibit "G." At this point in the discussion and in connection with this phase of the case, we find it necessary to consider two certain writings executed after the date of the new bond and mortgage.

Exhibit "L": Agreement dated April 29, 1901. By this agreement, which recites the consent of the lessor of the Langcliffe property, the lease, etc., is assigned by the Langcliffe Coal Company to the Langcliffe Coal Company, Limited.

Exhibit "M": A deed, dated April 29, 1901, by which the Langcliffe Coal Company, Limited, conveys to the Hudson Coal Company all its properties, subject to the mortgage of the Continental Trust Company.

Thus it appears that on April 29, 1901, the character of the

Langcliffe property as a security was improved to the advantage of the trust company, and the trust company, at the date aforesaid, and up to the present time, has been and is in possession of three several securities for the payment of the same loan, with ample legal remedies for the enforcement of its claims.  We cannot help commenting upon this unusual delay.  Upon any default occurring between 1893 and 1896, the trust company could have proceeded on the Brooks and Mears bond and mortgage and on the other two securities.  From 1896 to 1901 it could have proceeded on the substituted bond and mortgage and on either or both of the other securities; and from 1901 to 1908 the date of the filing of the bill, the trust company was in better shape than ever to pursue its legal remedies on all the securities.  Instead of asserting its rights at the proper time on the law side of the court, it waits until the two principal parties in the case are dead, and now it comes into a court of equity asking for relief, after a delay of seven, twelve or fifteen years, as the case might be under the facts.

Without considering the question of laches we hold that the demurrers filed by the respective executors of the Brooks and of the Mears estates must be sustained on two grounds: first, the plaintiff's bill discloses no ground for equitable relief as against the estates of Brooks and Mears, the plaintiff having had at all times adequate remedies at law at its command; and second, the bill does not show any such liability on the part of Brooks and Mears as would require their estates to account as prayed for in the bill.

We shall now proceed to consider another ground of demurrer, the same being assigned by each defendant, viz., the omission from the list of defendants of the New York, Susquehanna & Western Coal Company.  In order to understand the force of this assignment we must refer again to some of the exhibits.  Exhibit "A," the first agreement between Brooks and Mears and the Hudson company, provided not only for the advance of $325,000 to Brooks and Mears, but also for a coal and tonnage arrangement.  Brooks and Mears were to sell and deliver to the Hudson company practically all the coal mined by them, and the Hudson company was to pay for

the coal monthly a certain price per ton based upon the prices at tide water and to furnish a sufficient number of cars, etc. The bond and mortgage given by Brooks and Mears to secure the loan to them was to be paid in a certain way, viz., the Hudson company was to deduct fifteen cents from the price of each ton of coal bought by it and to apply the same on the mortgage debt. Exhibit "B" is a coal and tonnage contract between the Langcliffe Coal Company and the Hudson company, of the same character as exhibit "A," except that it contains no reference to the mortgage. Under this contract the Hudson company may assign all its rights to a third party. There is a similar provision in exhibit "A." An analysis of the two exhibits lead us to the conclusion that there was no legal difficulty in the way of one party holding the coal and tonnage contract and another party holding the bond and mortgage; and that is what happened in this case. The Continental Trust Company, in 1893, by assignment, exhibit "E," became the owner of the bond and mortgage, exhibit "C," the Hudson company still retaining its rights in the contract relating to the purchase and sale of the coal under exhibits "A" and "B." This was the situation on August 15, 1893, when the Hudson company assigned the Brooks and Mears bond and mortgage to the trust company.

Later, on September 28, 1893, the Hudson company assigned to the trust company the two agreements, exhibits "F" and "G," the one constituting the Langcliffe property as additional security for the loan, and the other constituting the capital stock of the Langcliffe Coal Company as additional security for the same purpose; but the trust company "shall not be deemed to assume any of the covenants or agreements of said agreement (exhibit 'F') on the part of the Improvement (or Hudson) Company." That is, the Hudson company still had the coal and tonnage contract.

On December 4, 1893, according to the eleventh paragraph of plaintiff's bill, the agreement itself not being given, the Hudson company conveyed to the New York, Susquehanna & Western Coal Company the coal and tonnage contract of April 20, 1892, and the latter company "assumed and under-

took all the covenants and agreements" of the Hudson company. There is no reason why this could not be done. The Susquehanna company simply took the place of the Hudson company, and from December 4, 1893, the trust company was to receive its payments on the mortgage from the Susquehanna company. We cannot ascertain from plaintiff's exhibit "N" who paid the various sums of money credited on the mortgage; but, from 1893 to November 18, 1897, the Susquehanna company was liable to the trust company for the payments on the mortgage. During this period the Susquehanna company was the assignee of the Hudson company's coal contract. At the end of this period, viz., on November 18, 1897, the Langcliffe Coal Company, Limited, entered into a direct contract with the Susquehanna company as to the coal. It was the same kind of a contract as that of the Hudson company, and is exhibit "J"; and it provided for the payment of the mortgage in the same manner as in the other agreements. The Susquehanna company continued to occupy the same relation with the coal properties until February 13, 1901. At this time the agreement, exhibit "K," was signed by the limited company and the Susquehanna company. This agreement canceled the original coal and tonnage contract between the Hudson company and Brooks and Mears. We do not see that the plaintiff has just ground of complaint on this score; because, in terminating the old contract, it was provided that the agreement should in no wise affect the lien of the mortgage given by the limited company, nor in any way impair its obligation as to the payment of the fifteen cents per ton on all coal mined. Indeed, we find that from the beginning, at every step in the transactions between the parties, the trust company's mortgage has been protected, so far as that could be done by written agreements and conveyances. Even the last exhibit we shall refer to, which is a conveyance to the Hudson Coal Company of all the properties of the Langcliffe Coal Company, Limited, executed April 29, 1901 (exhibit "M"), states in apt terms that the conveyance is made and received especially subject to the mortgage of the trust company.

We do not understand why the Susquehanna company has not been made a defendant in this case. There is as much reason for making this company a defendant as there is for making the Hudson company a defendant. Each bears the same relation as the other does to the trust company and its mortgage. The Hudson company agreed to buy and sell the coal from the Langcliffe properties and to pay fifteen cents per ton on the mortgage. The Susquehanna company agreed to do the same thing. We can gather from exhibit "N" that the only thing done by the Hudson company under its coal contract, was to advance the loan of $325,000, because the first credit given on the mortgage was in 1896. And the money paid then must have been paid by the Susquehanna company. It was the latter company that bought and sold the coal for many years, and the accounts of this company and its relation to the transactions in this case, if at all the subject of investigation in equity, are just as important as those of any other defendant.

We, therefore, hold that the New York, Susquehanna & Western Company should have been a defendant in this case, and that the demurrer on this point should be sustained. It may be that the foregoing discussion is useless, in view of the opinion we hold as to the merit of the whole bill.

We shall now consider the other ground of demurrer assigned by the three defendant companies. It is, in substance, that the plaintiff has an adequate remedy at law. What are the prayers of the plaintiff in its bill? What are the particular forms of equitable relief it demands?

1. That the amount due on the mortgage of the Langcliffe Coal Company, Limited, be ascertained and that said amount be declared to be a first lien upon the property described in said mortgage.

2. That the rights of the complainant in the other property not specifically embraced in said mortgage be ascertained and decreed.

3. That the executors of the estate of Brooks and Mears, the Langcliffe Coal Company, Limited, the Langcliffe Coal Company, and the Hudson Coal Company, make discovery

of the amount of coal mined from the several properties during certain periods, and that they.account for the same.

4. That a receiver be appointed to take charge of the several properties.

5. That the court decree a sale of the mortgaged premises and of the other property.

The foregoing are the forms of relief prayed for by complainant. We have already discussed at considerable length the proposition that the plaintiff has an adequate remedy at law. All that we have stated is applicable to the demurrers now under consideration; but we shall briefly continue the discussion in the light of some well-known principles of law.

.1. We have no power to decree the sale of mortgaged property.

·The leading case of Ashhurst et al. v. Montour Iron Co., 35 Pa. 30, decides this. We quote from the syllabus of this case: "The courts of Pennsylvania have no jurisdiction in equity, to decree a sale of mortgaged premises, at the instance of the mortgagee although the mortgagor may be a corporation, and the mortgage given in trust to secure its bonds. They might require jurisdiction in a suit by the cestuis que trust against the mortgagees, and having thus assumed jurisdiction of the subject-matter, proceed to decree a sale for the benefit of the bondholders; but they cannot do so at the suit of the mortgagees against the mortgagor."

Nor is the doctrine of the Ashhurst case changed by Winton's App., 97 Pa. 385, where a supplemental bill was ·entertained in aid of a final decree in equity, to compel the carrying out of the decree and to give full and complete effect to it; and where, under exceptional circumstances, a sale of mortgaged premises was ordered.

A case very much like the contract and bond and mortgage involved in the case at bar is that disclosed in the New York & Scranton Construction Company v. Winton, 208 Pa. 467. This case indicates to the plaintiff the remedy open to it on its principal security, viz., a scire facias sur mortgage.

2. The plaintiff has no standing because of the prayers for discovery.

The discovery sought is not in aid of any action pending, or of any judgment or decree, or of any execution.  On this point we refer particularly to Black v. Bohlen, 175 Pa. 491, and to Bank v. Kern, 193 Pa. 59, and Holland v. Hallahan, 211 Pa. 223.

3.  There is no question of trust, or the rights of a trustee or of a cestui que trust, or of an account, in the case.

The nearest suggestion of such matters is found in the ownership by the plaintiff of the entire capital stock of the Langcliffe Coal Company; but, as we have already stated, the plaintiff has now, and has had for years, a choice of summary legal remedies in relation to this stock.

After a careful consideration of plaintiff's bill of complaint and of all the exhibits in the case, we are of the opinion that no such facts have been presented as would justify the interference of a court of equity.  We therefore make the following order:

Now, June 28, 1909, after argument and on due consideration, the demurrer of each of the defendants is sustained and plaintiff's bill of complaint is dismissed at plaintiff's costs.

*Error assigned* was decree dismissing bill.

*Frank P. Prichard,* with him *William J. Hand* and *Leventritt, Cook and Nathan,* for appellant.—The fact that the jurisdiction in equity is clear and that it is more convenient than the remedy at law is sufficient to sustain the bill: Cook v. Carpenter, 212 Pa. 165.

When a cause is once within the grasp of a court of equity it has no need to call in the aid of a court of law: Odd Fellows Sav. Bank's App., 123 Pa. 356; Winton's App., 97 Pa. 385.

*John P. Kelly* for estate of Reese G. Brooks, deceased, and *H. C. Reynolds,* for estate of John A. Mears, deceased, appellees.—There is a full, adequate and complete remedy at law: Ashhurst v. Iron Co., 35 Pa. 30.

*James H. Torrey,* of *Welles & Torrey,* for Langcliffe Coal Company, Langcliffe Coal Company, Limited, and the Hud-

son Coal Company.—The courts of Pennsylvania have no jurisdiction in equity to decree a sale of mortgaged premises at the instance of the mortgagee: Ashhurst v. Iron Co., 35 Pa. 30; Bradley v. Railroad Co., 36 Pa. 141; Winton's App., 97 Pa. 385.

OPINION BY MR. JUSTICE MESTREZAT, March 28, 1910:

In the elaborate opinion filed by the learned judge of the common pleas, he has analyzed and considered the numerous agreements of the many parties involved in this controversy, and has conclusively demonstrated that the plaintiff company has an adequate and efficient remedy at law to enforce the repayment of its loan.

On March 23, 1896, the Langcliffe Coal Company, Limited, substituted its bond and mortgage for the original bond and mortgage of Brooks and Mears which were given to secure the loan of $325,000. The mortgage is to secure the same debt, and includes the same land as the Brooks and Mears mortgage. It contains the usual default clauses providing a remedy for collection, and was duly assigned to the plaintiff. By the agreement of September 25, 1893, exhibit "F," the property of the Langcliffe Coal Company was made additional security for the payment of the original and substituted bond and mortgage, and became effective as of April 20, 1892, the date of the Brooks and Mears agreement and mortgage. The plaintiff holds this agreement, the seventh paragraph of which provides: "In case of default on the part of the party of the first part, its successors or assigns, in any of the obligations hereof on the part of it, them or any of them, and such default shall continue for the space of sixty days, the whole of said principal sum of three hundred and twenty-five thousand dollars, with all arrears of interest, shall and may, at the option of the party of the second part, its successors or assigns, become and be forthwith due and payable." By virtue of the agreement of September 25, 1893, exhibit "G," the plaintiff company also holds as additional security for its loan the whole of the capital stock of the Langcliffe Coal Company. In case of default in any of the conditions

of the Brooks and Mears bond and mortgage or in the substituted bond and mortgage, the agreement provides that the holder of the stock may deal with it as if he were the beneficial owner, or he may sell it for such price as he thinks fit, or may enter into possession of the corporate property and work the mines, or, as the owner of all the stock, may sell the property of the company, applying the proceeds, less costs and expenses, to the payment of the bond and mortgage.

These are the securities held since 1896, by the plaintiff for the repayment of the loan. If, as the plaintiff company alleges, default has been made in the payment of the principal and interest of the loan, its remedies at law for enforcing payment have at all times been adequate and effective without invoking the aid of a court of equity. The mere fact that a creditor has several securities for his debt does not confer jurisdiction on equity to enforce payment of the claim. A scire facias is the proper remedy for foreclosing the substituted mortgage of the Langcliffe Coal Company, Limited. An appropriate action at law will lie on the agreement of September 25, 1893, to subject the property of the Langcliffe Coal Company, not included in the Brooks and Mears mortgage, to payment of the loan; and it is suggested by the learned judge of the common pleas that the agreement and mortgage may be treated as one obligation for the payment of the loan, and that a judgment on the scire facias would cover the Langcliffe Coal Company property as well as the Brooks and Mears property. The agreement of September 25, 1893, it will be observed, provides numerous and effective remedies for realizing on the capital stock of the Langcliffe Coal Company, and affords an opportunity for controlling the company itself.

The sale of the Langcliffe Coal Company's property to the present owner does not affect the plaintiff company if, as it avers, the purchaser took title to the property with notice "of all the agreements and indentures recited in this bill, and of all the facts hereinbefore set out." The plaintiff was not affected by the agreement, exhibit "K," canceling the

original contract between the Wilkes-Barre & Hudson River Improvement Company and Brooks and Mears, as it provided that the agreement should in no wise affect the lien of the mortgage given by the Langcliffe Coal Company, Limited, nor affect or impair in any manner its obligation to pay fifteen cents per ton for all coal mined. We can see no necessity for an accounting to enable the plaintiff to realize on its securities. When the mortgagee issues a scire facias on the mortgage, the amount paid and the amount yet due thereon can, as in the ordinary case, be readily ascertained. As the bill shows no ground for an accounting, the prayer for discovery, incidental to the accounting, must be denied. If plaintiff should find that it needs discovery in aid of its action at law, a court of equity will lend its assistance for the purpose.

The exhaustive opinion filed by the trial court renders further discussion unnecessary.

Decree affirmed.